1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8

9

10   **ZANE HARDIN,**                    )        **CIV-F-08-0617 AWI BAM**
                                         )
11              **Plaintiff**,           )        **ORDER RE: DEFENDANT'S**
                                         )        **MOTION FOR SUMMARY**
12        **v.**                         )        **JUDGMENT**
                                         )
13   **WAL-MART STORES, INC.; and DOES** )
     **1-100,**                          )
14                                       )
                                         )
15              **Defendants**.          )
     _____       )

16

17

18                              **I. History**

19        Plaintiff Zane Hardin ("Plaintiff") has been an employee of Defendant Wal-Mart

20   ("Defendant") for several years.  Broadly, Plaintiff alleges that Defendant discriminated against

21   and harassed him on the basis of age and physical disability, and then retaliated against him when

22   he asserted his rights.

23        Plaintiff originally filed this case in state court on March 20, 2008; it was removed to

24   federal court on diversity jurisdiction.  The active complaint is the third amended complaint,

25   which includes fourteen causes of action.  The remaining claims are: employment discrimination,

26   retaliation, harassment, and denial of reasonable accommodation in violation of California's Fair

27   Employment and Housing Act ("FEHA"); violation of California's Business & Professions Code

28   §17200; violation of California Civil Code §51; intentional infliction of emotional distress;

                                            1

1  breach of contract; promissory estoppel; conversion; negligent infliction of emotional distress;

2  wrongful demotion; and defamation.

3

4  **II. Legal Standards**

5  Summary judgment is appropriate when it is demonstrated that there exists no genuine

6  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

7  Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v.</u>

8  <u>American Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

9  judgment bears the initial burden of informing the court of the basis for its motion and of

10  identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an

11  absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986);

12  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

13  might affect the outcome of the suit under the governing law. See <u>Anderson v. Liberty Lobby,</u>

14  <u>Inc.</u>, 477 U.S. 242, 248-49 (1986); <u>Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings</u>

15  <u>Assn</u>, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

16  sufficient evidence for a reasonable jury to return a verdict for the non-moving party. <u>Anderson</u>

17  <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Long v. County of Los Angeles</u>, 442 F.3d

18  1178, 1185 (9th Cir. 2006).

19  Where the moving party will have the burden of proof on an issue at trial, the movant

20  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

21  movant. <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-

22  moving party will have the burden of proof on an issue at trial, the movant may prevail by

23  presenting evidence that negates an essential element of the non-moving party's claim or by

24  merely pointing out that there is an absence of evidence to support an essential element of the

25  non-moving party's claim. See <u>James River Ins. Co. v. Schenk, P.C.</u>, 519 F.3d 917, 925 (9th Cir.

26  2008).  If a moving party fails to carry its burden of production, then "the non-moving party has

27  no obligation to produce anything, even if the non-moving party would have the ultimate burden

28  of persuasion." <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies</u>, 210 F.3d 1099, 1102-03 (9th

1    Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing

2    party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec.

3    Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party cannot "'rest

4    upon the mere allegations or denials of [its] pleading' but must instead produce evidence that

5    'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v.

6    Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

7         The evidence of the opposing party is to be believed, and all reasonable inferences that

8    may be drawn from the facts placed before the court must be drawn in favor of the opposing

9    party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad,

10   Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

11   and it is the opposing party's obligation to produce a factual predicate from which the inference

12   may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006);

13   UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

14   material fact does not spring into being simply because a litigant claims that one exists or

15   promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

16   15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

17   Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

18   "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or

19   'is not significantly probative.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986);

20   Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has

21   the discretion in appropriate circumstances to consider materials that are not properly brought to

22   its attention, but the court is not required to examine the entire file for evidence establishing a

23   genuine issue of material fact where the evidence is not set forth in the opposing papers with

24   adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir.

25   2003).  If the non-moving party fails to produce evidence sufficient to create a genuine issue of

26   material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine Ins.

27   Co. v. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000).

28

**3**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. Statement of Material Facts

**A. Defendants' Statement of Undisputed Material Facts**

1.      Wal-Mart store number 2985 in Fresno, California hired Plaintiff on November 26, 2001 as an hourly Sporting Goods Sales Associate.   (UNDISPUTED)

2.      Plaintiff continues to be employed by Wal-Mart store 2985 as Sporting Goods Sales Associate. He has been on a Leave of Absence since September 21, 2011.  (UNDISPUTED) [It is undisputed Zane presently has 4th Stage Cancer, and the trial was advanced because of this.]

3.      On December 10, 2010, plaintiff filed his Third Amended Complaint.  Following Wal-Mart's Motion to Dismiss/Strike parts thereof, the 7th, 9th, 12th, 14th and 15th causes of action were dismissed. The remaining causes of action are: (1) violation of FEHA; (2)  violation of CA Business & Professions Code § 17200; (3) violation of CA Civil Code § 51 ("Unruh Act"); (4) intentional infliction of emotional distress; (5) breach of contract; (6) promissory estoppel; (8) conversion; (10) negligent infliction of emotional distress; (11) wrongful demotion; (13) defamation.  (UNDISPUTED)

4.      In his Second Amended Complaint and discovery responses plaintiff alleges to have applied for numerous Department Manager positions between 2001 and 2004. (UNDISPUTED)

5.      Plaintiff's Third Amended Complaint alleges in its first cause of action under FEHA that he was discriminatorily denied promotions based on his age and/or disability. (UNDISPUTED)

6.      Plaintiff also testified in January 2010 that he last applied for a Department Manager position on November 14, 2004. (UNDISPUTED)

7.      Wal-Mart's internal business records indicate that plaintiff's last application for promotion

1    was August 28, 2004 for the position of Department Manager for Department 8 (Pets), for which

2    he interviewed on September 1, 2004.

3

4    8.    On February 9, 2008 Plaintiff filed a Fair Employment and Housing Act (hereinafter

5    "FEHA") administrative charge against Wal-Mart alleging a denial of promotion based on age

6    and disability. (UNDISPUTED)

7

8    9.    Almost three and half years lapsed between the last alleged denial of promotion in

9    November 2004 and the filing of Plaintiff's FEHA charge in 2008. (DISPUTED)

10

11   10.    After Wal-Mart filed its MSJ, plaintiff filed a Declaration in July 2010 in support of his

12   opposition to the MSJ for the first time alleging that he "probably" applied for a department

13   manager position in 2007 and updated his Third Amended Complaint accordingly.

14   (UNDISPUTED)

15

16   11.    Plaintiff testified again in December 2011 that he could not recall when he applied for

17   Stationary Department Manager position. He could not recall the year of the application, who

18   vacated the position, what manager he applied with, who received the promotion, and could

19   identify nobody who could confirm that he applied for such a position at any time between date

20   of hire and the present. (DISPUTED)

21

22   12.    In 2005, Wal-Mart instituted the Career Preferences system which resulted in automating

23   the promotions process such that hourly Associates had to pre-register their career advancement

24   interests on this computerized system. The Associate uses the system to research different

25   positions, set current interests and set future goals.  Only those who expressed their interest in a

26   position could be considered for a position once the position became available.   (DISPUTED)

27

28   13.    To be considered, internal applicants must have indicated their interest in the open

positions through the Career Preference system and meet the minimum requirements to remain

on the Qualified and Interested Applicant Listing.  If an applicant has not indicated his/her

preference for promoting to certain positions, he/she will not be eligible to apply or considered an

applicant for an open position.  (UNDISPUTED)


14.    Wal-Mart's records of Mr. Hardin status in the Career Preference system indicate

plaintiff's never identified or added any position to which he wished to be promoted to his Career

Preference profile Therefore, Wal-Mart business records indicated he did not apply for any

promotions during and after 2005, when the Career Preferences system was implemented. In

addition, the "Interview notes" section of his profile contains no data.


15.    Plaintiff admits he is aware that job applications must now be submitted on a computer

system. He admits  he does not recall using the Career Preferences system or logged onto

Wal-Mart's computer system to apply for a job promotion.  (UNDISPUTED)


16.    All Associates are required to take a "Computer Based Learning" (CBL) course about the

Career Preferences system. Wal-Mart's CBL system electronically records the CBL courses

Associates complete. (UNDISPUTED)


       Mr. Hardin's CBL Report as maintained in the regular course of business and printed as

of March 17, 2011 indicates that Mr. Hardin was provided with the training about the Career

Preference system's requirement by the Course "Career Preference" on March 18, 2006, and the

"Career Pref for Mgmt Positions" on April 26, 2007.


17.    Plaintiff claims that his attorney's September 15, 2007 pre-suit demand letter which

demands Plaintiff be promoted, constitutes a job application. (DISPUTED)

18.   Plaintiff alleges in his Third Amended Complaint that Wal-Mart managers denied him the right to park in the designated Disabled Persons Parking spot on days be worked, and days that he was at Wal-Mart as a customer".  (UNDISPUTED)

19.   Plaintiff testified that his disability stems from a back injury on October 24,2004. Plaintiff has a mobile disabled placard for his car and a disabled license plate on his motorcycle. (UNDISPUTED)

20.   Plaintiff contends that the alleged denial of disabled parking is a failure to reasonably accommodate a disabled person, in violation of FEHA.  (UNDISPUTED)

21.   Plaintiff contends that the alleged denial of disabled parking violates California Business & Professions Code § 17200 and California Civil Code § 51. (UNDISPUTED)

22.   Wal-Mart has a policy which requires its associates  to park in a designated area of the parking lot for the purpose of providing its customers with the most convenient spots and not to impede customers' access.  (UNDISPUTED)

23.   Wal-Mart's parking policy (PD-28) allows for accommodations to associates who have disabilities.  (DISPUTED)

24.   Fresno store 2985 has an uncovered parking lot that faces the store's front door ("front parking lot").  Disabled parking spaces available to disabled customers and disabled Associates are located in a row of parking spaces closest to the store's front door.

25.   Store 2985 also has a Tire Lube & Express ("TLE") Department which is located on the backside of the store. There are three (3) uncovered parking spaces near the TLE Department, one of which is a designated disabled parking space.  Wal-Mart's parking policy states that a

"Facility Manager will designate areas for Associate parking at each facility, including parking for Associates with disabilities".   (UNDISPUTED)

26.     Plaintiff was made aware of Wal-Mart's parking policy (PD-28) at orientation. (DISPUTED)

27.     Plaintiff testified that there are "30 or 40 disabled spaces in front of the store". (UNDISPUTED)

28.     Wal-Mart requires all Associates who are scheduled to work to enter/exit through the front doors of the store unless their car is being serviced by TLE. The policy applies equally to plaintiff's store and has applied since plaintiff's date of hire.  (DISPUTED)

29.     When Donald Wallis managed the store, all associates at store 2985 were made aware of Wal-Mart's policy that they must enter/exit through the front door on days they are scheduled to work unless they are having their vehicle serviced by the Tire Lube & Express department or work for TLE.  (DISPUTED)

30.     Plaintiff testified that the only Associates he has seen using the TLE entrance to enter/exit the store are TLE Associates. (UNDISPUTED)

31.     Plaintiff testified that Wal-Mart Assistant Manager, Michael Nash, spoke to him about not parking in the disabled parking spots.  (UNDISPUTED)

32.     Plaintiff's TAC alleges Robbie Alvarado threatened to fire him if he parked in the TLE's disabled parking space.  (UNDISPUTED)

33.     Alvarado testified that he simply asked plaintiff not to park his motorcycle in the TLE

1  department parking spaces. Alvarado testified he did not know whether plaintiff was disabled,
2  and did not recall whether he was using the single disabled parking space.  Alvarado testified that
3  he did not recall the interaction involving disability. Alvarado testified that he simply asked
4  plaintiff on the salesfloor to move his vehicle from TLE parking. He testified that Associates are
5  to enter/exit through the front door. He testified that plaintiff asked only if he could move it right
6  away, Alvarado agreed, and  that plaintiff moved his vehicle without discussion. Alvarado denies
7  threatening to fire plaintiff.  Alvarado testified that if he asked him to move from the disabled
8  TLE parking space, he would have at most asked him to move to a disabled parking space in the
9  front parking lot.  (DISPUTED)

11  34.      Michael Nash and Robbie Alvarado are Assistant Managers at Plaintiff's store.
12  (UNDISPUTED)

14  35.      The alleged parking-related conversations took place in mid-2007.   (DISPUTED)

16  36.      According to a letter written by Plaintiff to Store Manager Mike Gillam on May 15 2007,
17  Nash first spoke to Plaintiff about parking his vehicle in the parking lot designated for customers
18  obtaining services from the store's TLE department.   (UNDISPUTED)

20  37.      Nash asked Plaintiff not to park in the TLE Department's parking, and Plaintiff informed
21  him that he was parking in the Department's disabled parking space and had the right to do so.
22  (DISPUTED)

24  38.      Plaintiff testified Nash stated that he (Nash) "understood" his right to park in a disabled
25  space. (UNDISPUTED)

27  39.      Plaintiff testified he told Nash that he would park in the front parking lot and did so.
28  (UNDISPUTED IN PART)

9

40.     Plaintiff alleges Nash asked if Plaintiff could park in the spaces closest to the disabled spaces.  (UNDISPUTED)

41.     Plaintiff testified he parked in the store's front parking lot, in the disabled spaces for three days.  (UNDISPUTED)

42.     After three days, Plaintiff resumed parking in the TLE's disabled space.  (UNDISPUTED)

43.     Plaintiff informed Store Manager Mike Gillam of the conversation and Gillam did not stop Plaintiff from continuing to park in a disabled space.  (UNDISPUTED)

44.     Plaintiff also testified that management offered that plaintiff could park his motorcycle on the sidewalk, closer to the front door than the disabled parking spaces.

45.     Nash reminded Plaintiff about their previous conversation and Plaintiff asserted that he was going to park in a disabled space, which is what he continued to do.

46.     As for Plaintiff's allegation that Nash ordered him not to park in the disabled space while shopping as a customer, Plaintiff states that the entire interaction involved Nash noting that Plaintiff was not to park in a disabled space, and Plaintiff not responding to Nash's comment and walking by.  (UNDISPUTED)

47.     Plaintiff's Third Amended Complaint alleges that "Wal-Mart retaliates by arbitrarily reducing his work hours and changing his schedule" and specifically that after the 2007 disabled parking exchange, Nash arbitrarily changed his hours.  Plaintiff alleges that changes in hours constituted retaliation and harassment under FEHA (first cause of action).  (UNDISPUTED)

48.     Plaintiff's time clock archives for 2006 confirm that he consistently worked an average of

approximately 30 hours a week during the weeks he was scheduled to work.  (Plaintiff took a leave of absence in January, February and Saturday of 2006).

49.     Plaintiff alleges that he was retaliated against in reduction of hours. (UNDISPUTED)

50.     Plaintiff testified that he remained a full-time associate in 2007.  (UNDISPUTED)

51.     Plaintiff's time clock archives for 2007 confirm that he consistently worked an average of approximately 30 hours a week during the weeks he was scheduled to work.  (UNDISPUTED)

52.     Plaintiff's time clock archives for 2008 and 2009 confirm that he worked an average of approximately 30 hours per week during the weeks he was scheduled. (UNDISPUTED)

53.     Plaintiff asserts that a prior agreement with former Store Manager Wallis entitled him to maintain full-time status if he works at minimum 28 hours, entitles him to maintain a 7:00 a.m. to 4:00 p.m. schedule, and entitles him to maintain eligibility for spousal health insurance coverage.  (UNDISPUTED)

54.     On March 29, 2006, Plaintiff indicated his preferred availability for scheduling as limited to between 7:00 a.m. and 4:00 p.m. and indicated his unavailability on Sundays, Mondays and Tuesdays. (UNDISPUTED)

55.     Plaintiff testified that his alleged agreement was not contemporaneously documented by the alleged parties to the alleged agreement. Plaintiff testified that before the March 2006 Availability, there was nothing in writing about the alleged agreement.  (DISPUTED)

56.     Plaintiff alleges that the March 2006 Availability 'confirmed' his prior alleged agreement with Store Manager Wallis that allegedly promised him full-time status and guaranteed him 28

hours of scheduled work per week between the designated hours, and full-time status. (DISPUTED)

57.    The March 2006 Availability states in pre-typed language:  "This form is no guarantee of a shift or minimum number of hours."  (DISPUTED)

58.    The pre-typed language on the March 2006 Availability has not been crossed out or changed on the March 2006 Affidavit.  (DISPUTED)

59.    There is no language, typed or written, on the March 2006 Availability that states that Plaintiff will retain full time status or maintain eligibility for spousal health coverage. (DISPUTED)

60.    Plaintiff alleges that in exchange for Wal-Mart (allegedly) agreeing to provide plaintiff with full-time status if he continued to work 28 hours/week at minimum, providing his wife health insurance and allowing him to log those hours during certain schedule of certain days/hours per week, that plaintiff offered Wal-Mart "an employee that can do the job, show up on time, and not cause problems". (UNDISPUTED)

61.    Plaintiff Complaint alleges that after he turned 62 years old (July 18, 2004, he made an appointment with then Store Manager Donald Wallis to advise him he had applied for social security benefits and to advise him that he would need to reduce his hours at Wal-Mart. He states that Wallis agreed to provide him three months off per year. He also states that Wallis told him to talk to Sporting Goods Department Manager Eleno Bernal to "work out a reduced schedule. I went to Eleno and we worked out a reduced schedule. As per agreement I would Wed., Thurs., Fri, and Sat. starting at 7:00 a.m. until 4:00 p.m…Don agreed with the scheduled…" (UNDISPUTED)

62.     Plaintiff's time clock archives for January 23, 2010 through April 23, 2010 show that plaintiff consistently worked less than 25 hours per week between January 16, 2010 and April 23 2010.  (UNDISPUTED)

63.     Plaintiff was classified as a part-time Associate on April 21, 2010.   Plaintiff signed a "Job Offer" to memorialize the change in his classification from full-time to part-time. (UNDISPUTED)

64.     Plaintiff alleges his April 2010 re-classification as a part-time employee constitutes a breach of contract (his fifth cause of action).  (UNDISPUTED)

65.     Plaintiff currently has health insurance coverage from Wal-Mart.  (UNDISPUTED)

66.     Plaintiff alleges in his sixth cause of action for Promissory Estoppel that Wal-Mart promised and represented it would provide him certain hours, schedule and benefits and that Plaintiff, at his detriment, continued to work at Wal-Mart in reliance of said promise. (UNDISPUTED)

67.     Plaintiff asserts that a prior agreement with a manager also entitles him to take 3 months of leave per year (January, February, and September).  (UNDISPUTED)

68.     Assistant Manager Michael Nash was hired by Wal-Mart on December 22, 1992 when he was hired to unload trucks. (UNDISPUTED)

69.     Nash began working at the subject store (store number 2985) on September 17, 2005 as department manager of the Tire Lube & Express department and later became Assistant Manager.  (UNDISPUTED)

13

1   70.    Nash is an Assistant Manager at the subject store.  (UNDISPUTED)

2

3   71.    There are tens of thousands of Assistant Managers employed by Wal-Mart retail stores

4   nationwide.  (UNDISPUTED)

5

6   72.    As an Assistant Manager at Wal-Mart, Nash oversees hourly associates who work in

7   various departments. His primary job responsibility is to implement the policies and procedures

8   and to ensure the associates he supervises complied with them as well.  (UNDISPUTED)

9

10   73.    Nash learns about Wal-Mart's policies and procedures through his Store Manager and

11   documents provided by Wal-Mart through its intranet system.  (UNDISPUTED)

12

13   74.    Assistant Managers do not possess the discretion or authority to deviate from corporate

14   policies and procedures.  Assistant Managers are completely uninvolved in the decisions that

15   ultimately determine corporate policy.  (DISPUTED)

16

17   75.    Donald Wallis and Michael Gillam were consecutive Store Managers of store number

18   2985 during Plaintiff's employment. (UNDISPUTED)

19

20   76.    There are thousands of Store Managers employed by Wal-Mart retail stores nationwide.

21   (UNDISPUTED)

22

23   77.    As Store Managers, Gillam and Wallis were responsible for familiarizing themselves with

24   Wal-Mart corporate policies and procedures, which are determined by Wal-Mart's home office in

25   Bentonville, Arkansas.   They were then required to implement those policies and ensure that

26   their subordinates, primarily Assistant Managers, are doing the same.   Store Managers do not

27   possess the discretion or authority to deviate from Wal-Mart's corporate policies and

28   procedures.(UNDISPUTED)

78.    Store Managers do not generate or determine Wal-Mart corporate policy, which is generated in Bentonville, Arkansas.  (DISPUTED).

79.    Plaintiff seeks to recover punitive damages for his retaliation and discrimination causes of action.  (UNDISPUTED)

80.    Plaintiff testified he does not know if Wal-Mart's corporate headquarters were singling him out by re-classifying him as a part-time associate.  (DISPUTED)

81.    Plaintiff wrote to then-district manager Ron Smoot (who is no longer employed by Wal-Mart) on November 17, 2004, requesting a daytime shift and referring to younger Associates who worked days and/or received promotions. (UNDISPUTED)

82.    Assistant Manager Mike Nash did not have authority to comment on or direct company policy.  (DISPUTED)

83.    Assistant Managers and Store Managers, do not have authority to influence or change company policy.  (DISPUTED)

84.    There are hundreds of Wal-Mart district managers nationwide.  (UNDISPUTED)

85.    District Managers, including Ron Smoot, do not have authority to influence or change company policy.  (DISPUTED)

86.    Store Managers and Assistant Managers do not have authority to make special employment arrangements with Associates. They may not promise perpetual annual Leaves of Absences, promises to provide an Associate a minimum number of weekly hours, promise full-time classification based thereon, or promise perpetual eligibility for spousal health

insurance. Wal-Mart must comply with the Employee Retirement Income Security Act. (DISPUTED)

87.    Don Wallis denies promising Plaintiff a minimum number of weekly hours, full-time classification based thereon, or perpetual eligibility for spousal health insurance.  Wallis denies observing Assistant Manager Kevin Mueller make any such promise to Plaintiff. (UNDISPUTED)

88.    Plaintiff's thirteenth cause of action for Defamation alleges that a verbal Coaching he received in November 2004 for unsafe work practices leading to an industrial injury, was a "false and misleading report" of which he was not made aware until it was produced in discovery in this matter, that it was created by 2 or more persons at Wal-Mart, that it damaged his reputation and ability to advance, and that it constitutes defamation.  (UNDISPUTED)

89.    Plaintiff testified he first saw the coaching when his attorney obtained a copy. (UNDISPUTED)

90.    Plaintiff testified he believes the Coaching damaged his reputation.  (UNDISPUTED)

91.    Per Wal-Mart's "Coaching for Improvement" policy, there are three levels of progressive discipline called: verbal coaching, written coaching and decision day coaching.  (UNDISPUTED)

92.    The "verbal" level Coaching consists of a verbal discussion between a manager and the Associate who is being coached. The discussion is then summarized by management in an electronic record, entitled "Coaching for Improvement". The second row on a printed version of the electronic record indicates the "Level" of the Coaching, for example "verbal" as relevant here. (UNDISPUTED)

93.     Plaintiff denies being coached at any time during his employment at Wal-Mart. (UNDISPUTED)

94.     Plaintiff admits he has "no idea who has seen [the Coaching]".  (DISPUTED)

95.     Plaintiff admits he has "no idea" who typed up the coaching. (DISPUTED)

96.     Per Wal-Mart's Coaching for Improvement policy, a verbal coaching need not be acknowledged by the Associate who is being coached. The electronic record of a verbal level coaching does not provide for the  signature, initial or other acknowledgment by the Associate who was coached. Therefore, a verbal level coaching does not include an "acknowledged" section for the Associate.  (UNDISPUTED)

97.     Plaintiff admits he does not know whether a verbal level coaching must be acknowledged by the person being coached, in order to comply with Wal-Mart policy. (UNDISPUTED)

98.     Plaintiff admits he has "no idea" whether his Coaching was pending while he applied for a job promotion.  (UNDISPUTED)

99.     Plaintiff admits he has "no idea" whether verbal level Coachings affect an Associate's eligibility to be considered for promotion. (UNDISPUTED)

100.    Per Wal-Mart policy and guidelines, in order for an Associate to be eligible to transfer to another positions within a facility, he/she must not have an active written level (or higher level). Accordingly, documentation relating to an Associate's verbal coaching is not placed in the Associate's personnel files and is not viewed by managers who are considering the Associate's application for promotion.  (DISPUTED)

101.    Plaintiff's Third Amended Complaint alleges "Wal-Mart Discriminates with Clothing: Zane wears a cap that said "Fishing" on the front." The Complaint alleges he was told to "remove it, even though other associates and managers are allowed to wear caps." (UNDISPUTED)

102.    Plaintiff's first cause of action under FEHA alleges that Wal-Mart retaliated against Plaintiff by "discriminat[ing] "on clothing". (UNDISPUTED)

103.    Plaintiff alleges that when Mike Gillam was the Store Manager, Assistant Manager Robbie Alvarado asked Plaintiff to remove a hat given to him by Mueller. (UNDISPUTED)

104.    Plaintiff alleges that Assistant Manager Kevin Mueller would from time to time give Plaintiff a hat or pin to wear while at work.  (UNDISPUTED)

105.    Kevin Mueller was an Assistant Manager at store 2985 between years 2001 and 2005. (UNDISPUTED)

106.    Mike Gillam was Store Manager at store 2985 between years 2005 and 2009. (UNDISPUTED)

107.    Plaintiff testified that Store Manager Gillam asked him to remove the hat and Plaintiff agreed.  (UNDISPUTED)

108.    Wal-Mart's Dress Code policies between 2001 and 2007 state that no hats are to be worn unless required by the work area or for Associates working outside.  Departure from the dress code policy is limited to special promotional events and remains at the discretion of management. (UNDISPUTED)

109.    The Sporting Goods Department Associates' work area does not require a hat and the Associates do not work outside.  (DISPUTED)

110.    Plaintiff's Third Amended Complaint alleges that Plaintiff used a stool as an accommodation for his back disability.  (UNDISPUTED)

111.    Plaintiff testified he began to use a stool when then Store Manager Gillam allowed him to use the stool.  Plaintiff testified that "Gillam is the one who originally okayed me to use [the stool]."  (UNDISPUTED)

112.    Plaintiff testified "…there was nothing in writing.  He just gave me his verbal okay on it." (UNDISPUTED)

113.    Ramirez managed store 2985 from September 2009 until September 2010. (UNDISPUTED)

114.    Plaintiff alleges in his Third Amended Complaint that during a 2-3 week period in 2009, his stool was repeatedly removed from the department. He would use another stool and it would be gone again the next day. (UNDISPUTED)

115.    Plaintiff alleges that during a 2-3 week period between December 2009 and summer 2010 Assistant Manager Greg Cox asked Plaintiff to store the stool in four different locations in the Department when Plaintiff was not scheduled to work.  (UNDISPUTED)

116.    During the 2-3 week period during which Cox allegedly asked Plaintiff to store the stool in four different locations, Plaintiff testified that Cox never removed the stool.  (DISPUTED)

117.    Plaintiff testified that Cox never asked him to stop using the stool.  (UNDISPUTED)

118.    Plaintiff alleges in his Third Amended Complaint that shortly before Christmas 2009, an hourly Associate named Eddie "tells [Plaintiff] a Manager said [Plaintiff] must buy his own stool."  (UNDISPUTED)

119.    Plaintiff does not recall if hourly Associate Eddie told him that a manager was requiring Plaintiff to purchase a stool. He testified "Uh…he might have." (UNDISPUTED)

120.    Plaintiff does not recall what manager allegedly told him he had to purchase a stool. He recalls no witnesses to the exchange. (UNDISPUTED)

121.    Plaintiff purchased a stool on December 23, 2009. (UNDISPUTED)

122.    Plaintiff's Third Amended Complaint states that the stool was eventually stolen and that its alleged theft amounts to Conversion (Eighth Cause of Action).  (UNDISPUTED)

123.    Plaintiff testified that upon his return from a summer vacation in 2010 near the end of the store's remodel, his stool had been stolen.  (UNDISPUTED)

124.    In a letter to Store Manager Buchta dated June 29, 2011, plaintiff alleges that his stool was either stolen or "smashed…in the compactor".  (UNDISPUTED)

125.    The store underwent a remodel from August 2010 to November 2010. (UNDISPUTED)

126.    Plaintiff testified he has "no idea" what happened with the allegedly stolen stool. (UNDISPUTED)

127.    Plaintiff testified he did not hear from anybody that management took his stool. (UNDISPUTED)

128.    Plaintiff testified he thought management took the stool because [Assistant Manager] told him where to place the stool.(UNDISPUTED)

129.    Plaintiff testified he knows of no witnesses to the alleged theft of the stool. (UNDISPUTED)

130.    Plaintiff testified he did not hear from anybody that the stool had been smashed in the compactor.  (UNDISPUTED)

131.    When asked why he alleged that it was "smashed in the compactor", Plaintiff testified, "Well, the compactor…crushes steel.  So the first I thought with this was they either threw the stool away, or somebody took it home with them. And that's why I said [sic] smashed the stool in the compactor, because that would seem to be a common practice when they had something they wanted to get rid of."  (UNDISPUTED)

132.    Plaintiff was not on the premises when the stool allegedly went missing and did not see anybody place his stool in the trash compactor, and did not from hear anybody that his stool had been placed in the compactor.  (UNDISPUTED)

133.    In his June  2011 letter, Plaintiff requests in writing to new Store Manager Kenneth "Mike" Buchta that he be allowed to use a stool. (UNDISPUTED)

134.    Plaintiff testified that following plaintiff's June 2011 letter, Buchta met with him, provided him with forms to complete, which Plaintiff believes Buchta sent to the corporate office, and had it approved. In the meantime Buchta told him to go ahead and use a stool. (UNDISPUTED)

135.    Plaintiff testified that in  July 2011 his request to use a stool while working was

approved, and Plaintiff was given a copy of the approval. (UNDISPUTED)

136.    Plaintiff testified Buchta did not tell him to purchase a stool.  (UNDISPUTED)

137.    Plaintiff testified that he was happy about the approval for the use of the stool.
(UNDISPUTED)

138.    Wal-Mart has and always has had a policy to prohibit discrimination, harassment and
retaliation in the workplace in compliance with federal and state laws.  (DISPUTED)

139.    Wal-Mart has a reasonable accommodation policy.

140.    When Wal-Mart approves the use of a tool for an Associate's job, environmental
adjustment or reasonable accommodation, Wal-Mart does not require that the Associate purchase
that tool.  (DISPUTED)

141.    On or around March 20, 2007, Qualified Medical Examiner Dr. Perminder Bhatia
indicates that plaintiff can work for 8 hours, stand and walk 4 hours, sit a total of 6 hours, should
push no more than 50 pounds, and lift no more than 20 pounds, no more than 10 pounds
occasionally, and that he cannot lift or carry 10 pounds frequently.  (UNDISPUTED)

142.    For Associates with industrial injuries, Wal-Mart stores maintains a file of related
documents separate and apart from their personnel file. Store 2985 maintained such a file relating
to Plaintiff Zane Hardin in the regular of course of business.  The most recent Physician Activity
Status Reports for service dates April 8, 2008, April 28, 2009, June 2, 2009, and October 19,
2009 all indicate that Plaintiff's restrictions was to return to work with the following restrictions:
"No lifting over 20 lbs. No bending greater than 4 times per hour. No pushing and/or pulling over
20 lbs. of force."  (UNDISPUTED)

22

143.    Plaintiff's Third Amended Complaint alleges a fourth cause of action for Intentional Infliction of Emotional Distress for allegedly "outrageous conduct" in allegedly harassing Plaintiff, discriminating against him, hiding/stealing his stool, violating agreements and demoting him. (UNDISPUTED)

144.    Plaintiff's tenth cause of action alleges Negligent Infliction of Emotional Distress for allegedly breaching its duty to provide a safe work environment by allegedly and negligently harassing, retaliating against and discriminating against Plaintiff.  (UNDISPUTED)

145.    Plaintiff's eleventh cause of action alleges Wal-Mart wrongfully demoted Plaintiff by reduction his work hours, changing his work days, eliminating his leaves of absence, and placing him on part-time status. Plaintiff alleges that harassment, discrimination, retaliation and violation of his civil rights was a motivating reason for Zane's demotion.  (UNDISPUTED)

146.    Donald Wallis was Store Manager at store 2985 in Fresno, California from August 2001 to May 2005. He was Store Manager when the store first opened and when Plaintiff was hired at store 2985 on November 26, 2001. Wallis is currently a Market Manager in Manchester, New Hampshire.  (UNDISPUTED)

**B. Plaintiff's Statement of Undisputed Material Facts**

1.    Zane was hired in 2001, and at the time only 28 hours/week was required to obtain full-time status. (UNDISPUTED)

2.    On 8/312/02 Wal-Mart employee Neilson harassed and retaliated against Zane, by yelling at him for refusing to work "off the clock".   Neilson told him "Older people can't do some things."

3.      On 7/18/04 Zane made an appointment with Store Manager Don Wallis about his work schedule, and need to reduce work hours because of Social Security benefits.  Mr. Wallis agreed that Zane would take January, February and September off.   A weekly work schedule was agreed upon. Wednesday-Saturday, 7 a.m. to 4 p.m.  Don said, "This will be Zane's set schedule."

4.      In 2004  Zane returned to work, and attempted to follow the agreed upon schedule, Assistant Managers Michelle and Jacklyn said "Zanes being a bad boy".  Michelle changed Zane's work days, and put him on 40 hours/wk, and Zane complained to Wal-Mart in writing, and reported "I am not a dog." I will not be "abused, humiliated, debased or disrespected by Wal-Mart's management."

5.      Zane was 62 in October 2004 when he injured his back at Wal-Mart. (UNDISPUTED)

6.      Zane complained to District Manager Ron Smoot about being discriminated against in pay, and in being passed over for promotion 24 times, by individuals less qualified than him. (UNDISPUTED)

7.      Zane was more qualified than other, younger workers under 40 years old hired over him.

8.      In 2006 Zane obtained a disability plaque for his vehicle.  (UNDISPUTED)

9.      On 5/9/07 Wal-Mart Assisant Manager Michal Nash ("Nash") told Zane he could not park in the TLE (Tire Lube & Express) disabled parking spot.   Zane buckled under the directive, and on 5/10/07, 5/11/07 and 5/12/07, he did not park in the TLE disabled parking space, and when Zane went to Wal-Mart as a customer during this timeframe, he did not park in the TLE disabled parking spot.

10.     On 5/9/07 Wal-Mart Assisant Manager Michal Nash ("Nash") told Zane he could not

**24**

park in the TLE (Tire Lube & Express) disabled parking spot.   Zane buckled under the directive, and on 5/10/07, 5/11/07 and 5/12/07, he did not park in the TLE disabled parking space, and when Zane went to Wal-Mart as a customer during this timeframe, he did not park in the TLE disabled parking spot.  (UNDISPUTED)

11.     Nash and Wal-Mart harassed and retaliated against Zane for exercising his legal rights. First, in 2007 Nash arbitrarily changed Zane's set work schedule, which forced Zane to complain in writing to Store Manager Mike Gillam.

12.     Nash told Zane he needed 34 hours for full-time status, and that "You would be better off part-time and that your wife don't need health insurance."  (UNDISPUTED)

13.     Zane explained to Nash that hires prior to January 1, 2002 only needed 28 hours/week for full-time status.  (UNDISPUTED)

14.     Nash continued to insist Zane needed 34 hours, and Zane had to hire a lawyer to write letters to Wal-Mart before it dropped the matter.

15.     Zane has been discriminated, harassed and retaliated against, off and on by Wal-Mart.

16.     For example, as explained in his 11/2/07 letter to Store Manager Gillam (true copy attached as Dec JAS, §8, Exh. 6(1):
Michael Nash has harassed me for a very long time.  I have asked you to correct the problems a number of times you have complied.  I appreciate you help, and the harassment continues. (emphasis added)

17.     Zane developed a good working relationship with new Store Manager Gillam, and he corrected some of Zane's employment problems.  In mid 2007, just before or after the May

incident described below with Mr. Michael, Nash, Zane probably applied for a Supervisor position in the Stationary Dept.   He was asked by Wal-Mart's counsel in deposition about whether he applied for the Supervisor position in the Stationary Dept. and at the time, he recalled applying, but could not recall when.  After reflecting on the matter, he recollects applying just before or after the incident with Nash on disabled parking spots.  The change in Store Managers from Don Wallis, and my improved relationship with Store Manager Mike Gillam, suggested that he might in fact be able to get the Supervisor promotion he had longed for, and hence applied for the opening in the Stationary Dept.  Although I preferred Sporting Goods, I wanted a Supervisor position, and was willing to work in Stationary to get one.

18.     Zane wore a cap that said "Fishing" on the front.  Nash retaliated against Zane, and told him to remove it, even though other associates and managers were allowed to wear hats.

19.     Assistant Manger Robbie Alvarvez told Zane to take off the cap, and after Zane asked for the rulebook, he flipped Zane off and told he was going to get him.

20.     Zane's back injury requires that he periodically sit down on a stool while working in Sporting Goods.  The stool costs $20.  He put the stool on top a nearby metal shelf.   He returned the next day the stool was gone.  No explanation was given. He went to get another stool, use it, put it on the shelf, and the next day it was gone.  This little cat and mouse game went on for 2-3 weeks.   Just before Christmas 2009, "Eddie" appeared in the Dept. and told Zane a Manager said Zane must buy his own stool, and place his purchase receipt on it.  WAL-MART refused to provide a $20 reasonable accommodation.

Zane bought my own stool, and placed my receipt on it.  For a time the stool no longer disappeared. However, recently, the stool was again removed, and Zane was not told where it is. This may be a theft.  It appears Zane will have to buy another stool, as Wal-Mart has not offered to pay for one.

21.     In October 2009 Mr. Victor Ramirez became the new Store Manager.   In violation of Zane's agreement with Wal-Mart he has cut Zane's hours to less than 28 per week, and refused to grant him his agreed upon January and February Leaves of Absence.

22.     Recently Assistant Manager Robbie told Zane that if he parked in the disabled parking in the TLE area, that he would be fired, and as a result of this threat, Zane stopped parking there.

22.a.   The harassment, retaliation and discrimination has caused Zane years of emotional distress, financial loss, frustration, worry, and hardship.

23.     Zane kept the job because sometimes things got better, and my wife needed the health insurance.  Zane estimates he has lost over $500,000 in monies and benefits from the discrimination in promotions.

24.     Zane's religious faith and optimism has sustained him, through the almost 10 years of on and off-again misconduct by Wal-Mart.

25.     Wal-Mart is actively seeking to terminate and remove elderly and disabled persons from employment.

26.     Wal-Mart targeted Zane.

27.     Nash directed Zane to not park in the disabled parking spots, and for a time Zane complied.  (UNDISPUTED)

28.     Nash was part of Wal-Mart's management.

29.     Nash harassed Zane about his parking.

30.     Nash read Zane's written complaint about his telling him to not park in the disabled parking spots, and Nash did not deny the allegation.

31.     After Zane insisted on parking in the disabled parking spots, Nash harassed Zane about his wearing a hat, when others in the store were allowed to.

32.     After Zane insisted on parking in disabled parking spots, Zane's schedule was changed, and it was a continuous daily routine to get his schedule back.

33.     After Zane insisted on parking in disabled parking spots, his hours were cut.

34.     After Zane insisted on parking in disabled parking spots, Nash threatened to put Zane on part-time status.

35.     After Zane insisted on parking in disabled parking spots, Nash told Zane his wife did not need health insurance.

36.     Zane had an agreement with Wal-Mart that he was to work at least 28 hours per week, and Wal-Mart violated the agreement by allocating Zane less than 28 hours per week.

37.     Wal-Mart's Store Manager Vincent Ramirez ignored Zane's requests to discuss the reduction in work hours and his leave of absence.

38.     Wal-Mart refused to promote Zane 25 times to Supervisor positions (Dec JAS, 8 Exh 6, Zane Dec,  43-52), when he was more qualified than others promoted over him (Dec JAS, 5, Exh 3, Young Depo p. 19, ls 12-21-Admission) (Dec JAS,8, Exh 6, Zane Dec  78; Wal-Mart refused to fill an open position Zane applied for and was qualified for, Dec JAS,  17, pp 108-109, ls13-5; Zane more qualified than a Ms. Ornelas, and she is promoted over him, Dec JAS, 17, Exh 17, pp

172-196, ls 23-19-Brandy Zobel Wal-Mart's Rule 30b6 corporate representative).

39.     Zane was harassed by a Supervisor for shopping when he was not on the clock.

40.     Zane was told he could not be a Manager because of his work injury.

41.     After Zane filed suit, Wal-Mart harassed, demeaned and retaliated against Zane for several weeks by removing and hiding his work sitting stool.

42.     After Zane filed suit, Wal-Mart Harassed Zane by refusing to provide Zane with a reasonable work accommodation, a $20 work sitting stool, and forcing Zane to pay for it.

43.     Assistant Manger Robbie Alvarvez told Zane to take off the cap, and after Zane asked for the rulebook, he flipped Zane off and told he was going to get him.

44.     Wal-Mart targetted Zane.

45.     After Zane insisted on parking in the disabled parking spots, Nash harassed Zane about his wearing a hat, when others in the store were allowed to.

46.     Assistant Manger Robbie Alvarvez told Zane to take off the cap, and after Zane asked for the rulebook, he flipped Zane off and told he was going to get him.

47.     After Zane insisted on parking in disabled parking spots, Zane's schedule was changed, and it was a continuous daily routine to get his schedule back.

48.     After Zane insisted on parking in disabled parking spots, his hours were cut.

49.     After Zane insisted on parking in disabled parking spots, Nash threatened to put Zane on part-time status.

50.     After Zane insisted on parking in disabled parking spots, Nash told Zane his wife did not need health insurance.

51.     Zane had an agreement with Wal-Mart that he was to work at least 28 hours per week, and Wal-Mart violated the agreement by allocating Zane less than 28 hours per week.

52.     Plaintiff received commendations for his performance as Police Officer.

53.     Plaintiff has made multiple written complaints to Wal-Mart regarding its treatment of him

54.     Wal-Mart has a progam to hire young, healthy, single part-time workers.

55.     Plaintiff repeatedly complained to Wal-Mart management about discrimination and harassment.  Nonetheless, the harassment and discrimination  continued.

56.     Nash admitted he was shown Zane's written complaint about Nash directing him not to use disabled parking spots, and that Nash was not reprimanded, or written up, or told to do any to address the parking issue.

57.     U.S. Supreme Court decision in Dukes v. Wal-Mart indicates Store Manages have broad discretion in hiring and promotion.

58.     In a letter dated 11/17/2004 Zane complained to District Manager Ron Smoot about being discriminated against in pay, and in being passed over for promotion 24 times, by individuals less qualified then him.

1    59.    Zane applied for the Supervisor position in Stationary in mid-2007.

2

3    60.    Zane was punctual, reliable, trustworthy, honest, professional, had specialized knowledge

4    on guns and ammo, and was great with customers.

5

6    61.    Zane was last denied promotion in mid 2007, when he applied for the Supervisor position

7    in Stationary.

8

9    62.    The TLE parking spot is standard legal disabled persons parking.

10

11   63.    Wal-Mart discriminated, harassed and retaliated against Zane from 2001 to the present,

12   including, and not limited to, denial of parking, hat, cutting hours, violating agreements on hours,

13   full-time status, and leave of absence, been the object of a derogatory hand gesture, had his stool

14   taken, been forced to purchase his own stool, overlook for promotion 25 times, and threatened

15   with termination, and physical harm.

16

17   64.    According to Wal-Mart's employee Alvarado Zane is a professional, honest, fair, good

18   with customers and cooperative.

19

20   65.    Wal-Mart employee Gregory Cox admitted he directed another work to remove Zane's

21   stool from his work area.

22

23   66.    Wal-Mart employee has not been disciplined for his mistreatment of Plaintiff.

24

25   67.    The Discrimination, Harassment and Retaliation have caused Zane emotional distress. It

26   was very upsetting for Nash to threaten to part-time status, because then Zane's wife of 50 years

27   would lose health insurance, and taking care of her is first and foremost. Manager Ramirez's

28   refusal to talk with Zane about his hours and leave of absence is emotional upsetting to Zane;  It's

condescending and degrading.

68.     Zane has lost over $500,000 in job benefits from the discrimination in failing to promote him.

69.     Wal-Mart did not offer an official reasonable accommodation to Zane for approximately 5 years, even though it knew he needed a stool accommodation.

70.     Plaintiff had to pay for his own stool at Wal-Mart's direction to accommodate his back injury.

71.     Three witnesses testified that Nash told Zane not to park in the disabled parking spots.

72.     Wal-Mart has recently threatened to fire Zane if he parks in the TLE disabled parking spot.

73.     Nash admitted in his deposition that it was Wal-Mart's corporate policy to not allow employees to park in the TLE, which explains why he and Robbie, have directed Zane not to parking in the disabled parking spots there.

74.     Wal-Mart denied in responses to requests for admissions that it directed Plaintiff not to use the disabled spot.

75.     Wal-Mart admitted it followed its policies and procedures in all its dealings with Plaintiff.

76.     Wal-Mart stated in interrogatory responses that no employee directed Plaintiff not to park in disabled parking.

77.     Wal-Mart employee Hayhurst was not aware of a policy that required entering the front entrance.

78.     With training, Plaintiff could have been a Store Manager.

79.     Punitive damages should be imposed as Wal-Mart has a corporate policy to defy the law as it authorizes its managers to direct which disabled parking spaces its disabled employees can park in. (Wal-Mart Ex. P), and this policy continues to today.

80.     Wal-Mart's Store Managers are managing agents for purposes of punitive damages given the broad discretion given to implement corporate policy.

81.     Wal-Mart violated the terms of the Burrell Consent Decree in its mistreatment of Plaintiff

82.     Wal-Mart policy is to advise its employees as to why they are not promoted.

83.     Wal-Mart has an affirmative obligation to advise workers of the reasonable accommodation process, and if they don't it's a violation of company policy and the law.

84.     Wal-Mart Store Manager told Plaintiff he would not be promoted because he was injured on the job.

85.     Wal-Mart harasses, retaliates and discriminates against Plaintiff from 2002 to 2011.

86.     Wal-Mart has a policy and procedure to retain documentation of complaints of harassment, retaliation or discrimination, and its Rule 30b6 witness saw none.

87.     Wal-Mart's failure to repeatedly keep Zane's written complaints of discrimination,

33

1    retaliation or harassment, is a gros violation of its policies and procedures.

2

3    88.    According to Wal-Mart's Rule 30b6 witness, Wal-Mart policy gives the power to the

4    facility manager to direct where associates with disabilities can park.

5

6                                        **IV. Discussion**

7    **A. FEHA**

8          Plaintiff alleges that "Wal-Mart refused to provide training or promote Zane, failed to

9    alert him to openings for positions he was qualified for promotion into, and engaged in harassing

10   and retaliatory actions, to discourage his efforts to advance at the company, and wrongfully

11   denied him employment terms benefits and privileges. Wal-Mart has denied, without explanation

12   (excepting for a singular reference by (Wallis), promotion approximately 25 times, and filled the

13   positions with younger and less qualified personnel....Zane's age and/or disabled status was/were

14   motivating reasons(s) for the adverse employment action." Doc. 100, TAC, at 17:9-24.  In

15   addition, Plaintiff argues "1) Zane was last denied promotion in mid 2007, when he applied for

16   the Supervisor position in Stationary. (DUF 9-Plaintiff's Response) 2) More importantly,

17   Plaintiff demanded a promotion through his lawyer's letter dated 9/15/07....The continuing

18   violation doctrine applies here as multiple acts of discrimination occurred within the statutory

19   period (even after suit was file). Thus, Wal-Mart is liable for the entire course of conduct,

20   including acts outside the statutory period. The discriminatory acts took different forms in

21   refusing to promote, refusal to park in disabled parking, changing schedules, cutting insurance,

22   hiding and then refusing to pay for his stool, and recently threatening to fire Zane if he parks in

23   the TLE disabled parking spots." Doc. 192, Opposition, at 13:22-14:14.  Plaintiff's FEHA claim

24   is based on discrimination, retaliation, harassment, and failure to accommodate.

25         FEHA analysis follows the burden-shifting analysis of <u>McDonnell Douglas Corp. v</u>

26   <u>Green</u>, 411 U.S. 792 (1973) in analyzing discrimination and retaliation claims. See Guz v.

27   Bechtel National, Inc., 24 Cal. 4th 317, 354 (Cal. 2000); <u>Loggins v. Kaiser Permanente Internat.</u>,

28   151 Cal. App. 4th 1102, 1108-09 (Cal. App. 4th Dist. 2007).  It is appropriate to consider cases

                                              **34**

interpreting federal anti-discrimination law in analyzing FEHA. See Brooks v. City of San

Mateo, 229 F.3d 917, 923 n.3 (9th Cir. 2000), citations omitted; Strother v. Southern Cal.

Permanente Medical Group, 79 F.3d 859, 866 (9th Cir. 1996) ("California courts have

interpreted §12940 in accordance with cases interpreting the Age Discrimination in Employment

Act, 29 U.S.C. §§ 621 et seq."); Finegan v. County of L.A., 91 Cal. App. 4th 1, 7 (Cal. App. 2d

Dist. 2001) (FEHA disability discrimination case). "[T]o prevail on summary judgment, [the

employer is] required to show either that (1) plaintiff could not establish one of the elements of

[the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to

terminate plaintiff's employment." Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc., 642 F.3d

728, 745 (9th Cir. 2011), quoting Avila v. Cont'l Airlines, Inc., 165 Cal. App. 4th 1237, 1247

(Cal. App. 2d Dist. 2008).

Of importance to this case, FEHA creates a strict distinction between discrimination and

harassment:

> Under FEHA, harassment is actionable 'if the defendant's conduct would have interfered
> with a reasonable employee's work performance and would have seriously affected the
> psychological well-being of a reasonable employee and [the plaintiff] was actually
> offended.' Aguilar v. Avis Rent A Car System, Inc., 21 Cal. 4th 121, 130 (Cal. 1999).
> Unlike other forms of discrimination, harassment or 'hostile work environment' claims
> concern actions 'outside the scope of job duties which are not of a type necessary to
> business and personnel management.' Reno v. Baird, 18 Cal. 4th 640, 647 (Cal. 1998).
> Personnel management actions commonly necessary to carry out the duties of business
> and personnel management, and thus outside the purview of harassment, include 'hiring
> and firing, job or project assignments, office or work station assignments, promotion or
> demotion, performance evaluations, the provision of support, the assignment or
> nonassignment of supervisory functions' and decisions regarding meetings. Reno v.
> Baird, 18 Cal. 4th 640, 646-47 (Cal. 1998).

Velente-Hook v. E. Plumas Health Care, 368 F. Supp. 2d 1084, 1102-03 (E.D. Cal. 2005),

citations omitted. Though the two kinds of FEHA causes of action are separate, evidence for one

may be applicable to the other: "acts of discrimination can provide evidentiary support for a

harassment claim by establishing discriminatory animus on the part of the manager responsible

for the discrimination, thereby permitting the inference that rude comments or behavior by that

same manager were similarly motivated by discriminatory animus." Roby v. McKesson Corp., 47

Cal. 4th 686, 709 (Cal. 2009). Plaintiff's allegations regarding FEHA blend together

discrimination, harassment, retaliation, and reasonable accommodation claims. The court will

1    analyze the them separately for clarity and completeness.

2

3    **1. Administrative Exhaustion and Statute of Limitations**

4        "Under the FEHA, the employee must exhaust the administrative remedy provided by the

5    statute by filing a complaint with the Department of Fair Employment and Housing (Department)

6    and must obtain from the Department a notice of right to sue in order to be entitled to file a civil

7    action in court based on violations of the FEHA. The timely filing of an administrative complaint

8    is a prerequisite to the bringing of a civil action for damages under the FEHA." Romano v.

9    Rockwell Internat., Inc., 14 Cal. 4th 479, 492 (Cal. 1996).  The DFEH complaint must be filed

10   within one year of the occurrence of the unlawful practice or complained of conduct. Cal. Gov.

11   Code §12960(d).  Plaintiff filed his complaint with the DFEH on February 9, 2008. Doc. 184, Ex.

12   D.  As an initial matter, Defendant argues that the statute of limitations for the approximately 25

13   denials of promotion has run out as those were acts that took place more than a year before

14   Plaintiff filed with the DFEH.   Plaintiff asserts that Defendant's actions constitute one course of

15   conduct that qualifies for the continuing violation doctrine.

16       For discrimination claims, the California Supreme Court has concluded that "the FEHA

17   statute of limitations begins to run when an alleged adverse employment action acquires some

18   degree of permanence or finality." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1059 (Cal.

19   2005).  Denial of a promotion is an adverse employment action that is sufficiently final. See

20   Zeinali v. Raytheon Co., 2011 U.S. Dist. LEXIS 70060, *10 (S.D. Cal. June 29, 2011) ("The

21   non-promotions had the degree of permanence that should have triggered Zeinali's awareness of

22   the need to assert his rights by filing a timely complaint with DFEH. He did not. As such, the

23   continuing violation doctrine is not applicable").  Plaintiff can not base his discrimination claim

24   on the denials of promotion that took place in 2004.

25       The analysis of Plaintiff's harassment claims are different:

26       courts applying the continuing violation doctrine have tended toward a broader view of
         that doctrine when the cause of action involves ongoing harassment or ongoing failure to
27       accommodate disability....

28       an employer's persistent failure to reasonably accommodate a disability, or to eliminate a

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind--recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. But consistent with our case law and with the statutory objectives of the FEHA, we further hold that 'permanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile.

Richards v. CH2M Hill, Inc., 26 Cal. 4th 798, 817 and 823 (Cal. 2001).  Plaintiff's allegations of harassment date back to 2002. Doc. 193, Plaintiff's SUMF, at 46:5-9.  Defendant does not challenge these allegations based on untimeliness.

**2. Discrimination and Retaliation**

Under FEHA, "to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment" based on certain protected characteristics (including age over 40 and physical disability) constitutes discrimination. Cal. Gov. Code §12940(a); Cal. Gov. Code §12926(b) and (l).  FEHA also prohibits retaliation against a person by an employer because "the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." Cal. Gov. Code §12940(h).  In the context of summary judgment, a plaintiff makes a prima facie case of discrimination by showing he/she was (1) within the protected group; (2) qualified for the prospective job or performing the existing job satisfactorily; and (3) subject to an adverse employment action; (4) due to the protected status. See Rome v. Smithkline Beecham Corp., 232 Fed. Appx. 711, 713 (9th Cir. 2007) (FEHA age discrimination; Finigan v. County of Los Angeles, 91 Cal. App. 4th 1, 7 (Cal. App. 2d Dist. 2001) (FEHA disability discrimination).  Similarly, for a prima facie retaliation claim under FEHA, "the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment

1  action, and there is a causal link between the protected activity and the employer's action."

2  Strother v. Southern Cal. Permanente Medical Group, 79 F.3d 859, 868 (9th Cir. 1996), citations

3  omitted.  Once a plaintiff establishes a prima facie case the burden shifts to the employer to offer

4  a legitimate, nondiscriminatory reason for the adverse employment decision; if the employer

5  offers a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that

6  the proffered reason is pretextual. Brundage v. Hahn, 57 Cal. App. 4th 228, 236 (Cal. App. 2d

7  Dist. 1997).

8          For Plaintiff, both of these FEHA claims are tied to adverse employment actions.  In this

9  case, first determining what qualifies as adverse employment actions under FEHA simplifies the

10  analysis.  "[I]n the employment context, the 'adverse employment action' threshold is met when

11  the employer's action impacts the terms, conditions, or privileges of the plaintiff's job in a real

12  and demonstrable way. In other words, a plaintiff must show that a reasonable person in the

13  circumstances would have viewed it as a serious and material change in the terms, conditions, or

14  privileges of employment. Examples include discharge, demotions, refusal to hire, nonrenewal of

15  contracts, and failure to promote. At the other extreme, courts have found no adverse

16  employment action where the complained-of conduct had no effect on the plaintiff's employment

17  status." Wilson v. Murillo, 163 Cal. App. 4th 1124, 1134-35 (Cal. App. 1st Dist. 2008), citations

18  omitted.

19          Plaintiff alleges he applied for a promotion, "In mid 2007...I probably applied for a

20  supervisor position in the Stationary Dept. I was asked by Wal-Mart's counsel in deposition

21  about whether I applied for the Supervisor position in the Stationary Dept. and at the time, I

22  recalled applying, but could not recall when. After reflecting on the matter, I recollect applying in

23  mid 2007." Doc. 190, Part 4, Ex. 6, Hardin Declaration, at 4:21-27 (5 of 58).  Plaintiff's

24  assertions are extremely tenuous.  In the recent deposition, he claims to have inquired with a

25  manager about the position; he admits he never filed a formal application of any kind and he does

26  not recall which manager he spoke to about the position. Doc. 185, Part 1, Ex. F, Dec. 28, 2011

27  Hardin Deposition, at 556:4-14 (20 of 60).  He states he does not remember in what year he

28  inquired about the promotion, who vacated the position to create an opening, who ultimately got

1   the promotion, or who were the relevant managers at the time. Doc. 185, Part 1, Ex. F, Dec. 28,

2   2011 Hardin Deposition, at 556:25-557:9 (20 of 60).  Defendant's Regional Human Resources

3   Manager states, "Wal-Mart's internal business records indicate that Plaintiff's last application for

4   promotion was August 28, 2004 for the position of Department Manager for Department 8 (Pets),

5   for which he was interviewed on September 1, 2004" and that Wal-Mart implemented a new

6   promotion process whereby associates apply online. Doc. 186, Ex. 5, Zobel Declaration, at 4:3-

7   5:20 (143-44 of 210).  Defendant's records show Plaintiff received training regarding the online

8   application process on March 18, 2006. Doc. 186, Ex. X. Hardin Training Report, at 2 (178 of

9   210).  Plaintiff admits he knew he had to apply online for promotions, had heard coworkers

10  discussing the online application system, but had never gone online to make an application. Doc.

11  193, Plaintiff's SUMF, at 7:22-26; Doc. 185, Part 1, Ex. F, Dec. 28, 2011 Hardin Deposition, at

12  554:23-555:1 and 557:10-16 (19-20 of 60).  Even taking all inferences in favor of Plaintiff, there

13  is insufficient evidence to show that he actually applied for a promotion.

14      Plaintiff also argues that a demand letter his attorney sent Defendant in which he

15  requested to be "Promoted to manager" constitutes an application for promotion which was

16  denied. Doc. 191, Part 1, Ex. 14, Sept. 15, 2007 Letter, at 1 (69 of 88).  This request is

17  problematic as it is an open ended demand for promotion that is not tied to an actual position.

18  Examples of adverse employment action include "termination, demotion, or denial of an

19  available job." Zeinali v. Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011).  There is no reason to

20  believe that denial of a request for promotion when there was no available position constitutes an

21  adverse employment action under FEHA.

22      Plaintiff alleges that he was threatened with bing fired.  "After I filed suit, Assistant

23  Manager Robbie tells me that if I park in the disabled parking in the TLE area, that I will be

24  fired, and as a result of this threat, I stopped parking there." Doc. 190, Part 5, Ex. 7, Hardin

25  Declaration, at 8:28-9:3 (9-10 of 35).  Plaintiff was not, in fact, fired.  If a threatened termination

26  is not carried out, it does not constitute an adverse employment action under FEHA. Lewis v.

27  UPS, Inc., 252 Fed. Appx. 806, 808 (9th Cir. 2007).

28      Further, there is no indication that telling an employee to change where he parks within a

39

1   parking lot constitutes an adverse employment action. "[T]he adversity must be material—it is

2   not enough that the alleged adverse conduct poses some de minimis inconvenience." Wilson v.

3   Murillo, 163 Cal. App. 4th 1124, 1136-37 (Cal. App. 1st Dist. 2008) (discussing adverse action

4   in public accommodations for disability context, a lower threshhold than adverse employment

5   action). An adverse employment action is an act that "materially affects the terms, conditions, or

6   privileges of employment....Minor or relatively trivial adverse actions or conduct by employers or

7   fellow employees that, from an objective perspective, are reasonably likely to do no more than

8   anger or upset an employee cannot properly be viewed as materially affecting the terms,

9   conditions, or privileges of employment and are not actionable." Yanowitz v. L'Oreal USA, Inc.,

10   36 Cal. 4th 1028, 1051 and 1054 (Cal. 2005). "A materially adverse change might be indicated

11   by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less

12   distinguished title, a material loss of benefits, significantly diminished material responsibilities,

13   or other indices that might be unique to a particular situation." Thomas v. Department of

14   Corrections, 77 Cal. App. 4th 507, 511 (Cal. App. 4th Dist. 2000), quoting Crady v. Liberty Nat.

15   Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). The parties do not cite to (and the court

16   can not find) any case law discussing parking as an adverse employment action. In this case, the

17   change was small: Plaintiff was told to move his motorcycle from one part of the parking lot to

18   another part of the same lot. The change appears to be an inconvenience rather than a material

19   loss of benefit. Further, at the most extreme, there is no allegation that Plaintiff was told to do

20   anything but park where all other employees were parked. As a matter of law, being treated

21   exactly like every other employee does not constitute discrimination due to protected status. See

22   McAlindin v. County of San Diego, 192 F.3d 1226, 1239 (9th Cir. 1999) (though denial of

23   training constitutes adverse employment action, fact that plaintiff received the same training as

24   other employees means there was no discrimination). This issue is further examined below under

25   FEHA's reasonable accommodation requirements.

26        The one solid assertion that does qualify as an adverse employment action is Plaintiff's

27   reduction in work hours and change in status from full time to part time. The parties do not

28   dispute that Plaintiff worked an average of 30 hours per week (during the weeks he worked)

between 2006 and 2009. Doc. 193, Plaintiff's SUMP, at17:14-18:14.  Starting January 23, 2010, Plaintiff consistently worked less than 25 hours per week; Plaintiff was redesignated as a part-time employee on April 21, 2010. Doc. 193, Plaintiff's SUMP, at 21:16-26.  Going through the elements of a prima facie case, Plaintiff was at least 65 years old at the time, he had a physical disability[1], and had already filed suit against Defendant; there is no indication that Plaintiff was not performing his job in a satisfactory manner.  The parties dispute whether the adverse employment action was due to age/disability/retaliation.

Defendant argues that "with three (3) years passing since his alleged disabled parking discussions (2007), and two (2) years passing since the filing of his FEHA Complaint (2008), plaintiff is unable to present any credible evidence to establish a temporal nexus between the alleged protected activity and the allegedly adverse job action of his eventual classification as a part-time Associate." Doc. 187, Brief, at 16:10-14.  Plaintiff alleges that he and store managers disputed his parking rights on two separate occasions.  First, Plaintiff states that Nash (assistant manager) told him in May 2007 that he could not park in the TLE parking area, threatening to cut his hours if Plaintiff used the disable parking spots. Doc. 190, Part 4, Ex. 6, Sept. 6, 2010 Hardin Declaration, at 5:5-14 (6 of 58).  Second, Plaintiff alleges "Recently Assistant Manager Robbie [Alvarado] told me that if I parked in the disabled parking in the TLE area, that I would be fired, and as a result of his threat, I have stopped parking there." Doc. 190, Part 4, Ex. 6, Sept. 6, 2010 Hardin Declaration, at 7:3-6 (8 of 58).  Plaintiff provides no time frame for the conversation. Alvarado confirms that he asked Hardin not to park in the TLE area, but states that the conversation took place "a long time ago, maybe three, four years ago" from 2011. Doc. 185, Part A, Ex. H, Alvarado Deposition, at 6:7-8 (36 of 60).  Alvarado's statement would place the

---

[1]"To qualify as a member of the protected class under FEHA, Gelfo must demonstrate his impairment constitutes a disability according to the statutory definition. It is insufficient for Gelfo simply to allege a disability or to identify an injury or physical condition. To proceed as a physically disabled person under the first prong of the statutory definition, Gelfo must demonstrate his injury or physical condition (in this instance, a low back injury, whose existence is undisputed) makes 'difficult' the achievement of work or some other major life activity." Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 47 (Cal. App. 2d Dist. 2006).  In this case, Defendant does not seem to contest that Plaintiff has a physical disability.

1   conversation in 2007 or 2008.  A two or three year gap between an incident and an adverse

2   employment action does not suggest that the incident caused the action. See Lawson v. Reynolds

3   Indus., 264 Fed. Appx. 546, 547 (9th Cir. 2008), citing Manatt v. Bank of America, 339 F.3d

4   792, 802 (9th Cir. 2003) ("no inference of retaliation arises on account of the nearly

5   twelve-month gap between her protected complaints and termination").

6        Regarding age discrimination, Plaintiff states that there was only one comment made

7   about his age. Doc. 189, Part 1, Ex. 2, Jan. 27, 2010 Hardin Deposition, at 338:15-339:9 (65-66

8   of 96).  That incident involved Nielson (assistant manager) telling Plaintiff in approximately

9   2002 that, "Older people can't learn some things." Doc. 190, Part 5, Ex. 7, Feb. 22, 2011 Hardin

10  Declaration, at 2:19 (3 of 35).  Plaintiff cites no other evidence that suggests his hours were cut

11  due to his age.  Again, the amount of time between the comments and the adverse employment

12  action does not give rise to an inference of causation.  Isolated and "'stray' remarks are

13  insufficient to establish discrimination" without other indicia of discriminatory intent. Merrick v.

14  Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir. 1990).  Indeed, "remarks...when unrelated to

15  the decisional process, are insufficient to demonstrate that the employer relied on illegitimate

16  criteria, even when such statements are made by the decision-maker in issue." Smith v. Firestone

17  Tire & Rubber Co., 875 F.2d 1325, 1330 (7th Cir. 1989).  Plaintiff points to no comments that

18  suggest disability discrimination.  As discussed below, there is no indication that Defendant

19  failed to provide him with reasonable accommodations for his physical disability.

20        Summary adjudication on FEHA discrimination and retaliation claims are granted.

21

22  **3. Reasonable Accommodation**

23        FEHA requires employers "to make reasonable accommodation for the known physical or

24  mental disability of an applicant or employee" and "to engage in a timely, good faith, interactive

25  process with the employee or applicant to determine effective reasonable accommodations, if

26  any, in response to a request for reasonable accommodation by an employee or applicant with a

27  known physical or mental disability or known medical condition." Cal. Gov. Code §12940 (m)

28  and (n).  Plaintiff argues that Defendant failed to meet its duties with respect to parking and

42

1    providing him with a stool while working.

2          Plaintiff asserts "My back injury requires that I periodically sit down on a stool while

3    working in Sporting Goods. After the suit is filed, I put the stool on top a nearby metal shelf. I

4    return the next day and the stool is gone. No explanation is given....Just before Christmas 2009,

5    'Eddie' appears in Sporting Goods Dept. and tells me a manager said I must buy my own stool,

6    and place my purchase receipt on it." Doc. 190, Part 5, Ex. 7, Feb. 6, 2012 Hardin Declaration, at

7    8:2-11 (9 of 35).  Plaintiff's receipt shows that he purchased the stool on December 23, 2009.

8    Doc. 190, Part 5, Ex. 7, Ex. D (16 of 35).  According to Plaintiff, the parties' dispute over the

9    stool arose after March 8, 2008 (the filing of the suit in state court).  Defendant argues that

10   "during the period in 2009 when he complains he was harassed for using a stool and wrongfully

11   denied a reasonable accommodation of using a stool for a disability that required him to sit, there

12   was actually no medical certification to support that claim." Doc. 187, Brief, at 19:26-20:1.

13   Plaintiff does not dispute that his doctor's report on April 8, 2008 (and several doctor's reports in

14   2009) only restricted his activity as follows: "No lifting over 20 lbs. No bending greater than 4

15   times per hour. No pushing and/or pulling over 20 lbs. of force." Doc. 193, Plaintiff's SUMF, at

16   43:11-27; Doc. 186, Ex. O, Physician Activity Status Reports, (128-31 of 210).  This is in

17   contrast to earlier doctor's reports which also limited the amount of time he could stand. See

18   Doc. 193, Plaintiff's SUMF, at 43:2-11; Doc. 185, Ex. E, Jan. 26, 2010 Hardin Deposition, at

19   89:5-18 (9 of 42).  The undisputed facts show that prior to the filing of the suit, when Plaintiff

20   could not stand for long periods of time, he was allowed to use a stool (which was presumably

21   provided by Defendant).

22         Requesting special parking can constitute a reasonable accommodation under the proper

23   circumstances. See <u>Mills v. Lynwood Unified Sch. Dist.</u>, 2009 U.S. Dist. LEXIS 69427, *14-15

24   (C.D. Cal. Aug. 6, 2009); <u>Johnson v. Alameda-Contra Costa Transit Dist.</u>, 2006 U.S. Dist.

25   LEXIS 67888, *37-38 (N.D. Cal. Sept. 8, 2006).  Defendant's national parking policy states, "an

26   Associate who has a valid permit issued by the state Department of Motor Vehicles, which

27   qualifies him /her to park in disabled-accessible parking." Doc. 186, Ex. R, (151 of 210).  With

28   respect to the specific store, Defendant regional human resources manager states "Disabled

1   parking spaces available to disabled customers and disabled Associates are located in a row of
2   parking spaces closest to the store's front door." Doc. 186, Ex. 5, Zobel Affidavit, at 2:23-24.  In
3   2007, Plaintiff had two conversations with Nash and one conversation with Gillam about
4   parking.  Plaintiff has provided evidence that Nash told him not to park in disabled parking and
5   to park where the non-disabled employees park. Doc. 190, Part 1, Ex. 3, Young Deposition, at
6   7:17-8:10 (4-5 of 28); see also Doc. 185, Ex. E, Jan. 26, 2010 Hardin Deposition, at 268:1-11 (24
7   of 42).  Plaintiff spoke with Gillam (store manager) to clarify that Plaintiff had the right to park
8   in disabled spots. Doc. 185, Ex. E, Jan. 26, 2010 Hardin Deposition, at 236:22-238:6 (17-18 of
9   42).  When Nash approached Plaintiff again, Plaintiff told him he talked to Gillam and that he
10  was going to use disabled parking.  These conversations show an active interchange on the issue
11  that satisfies the interactive process requirement.

12          There is some dispute over whether Plaintiff ever actually used non-disabled parking
13  while these conversations were taking place over the course of a few weeks.  Initially, Plaintiff's
14  version of events was: "Q. And so, after you had the disabled plaque since 2006, mid-2006, you
15  consistently parked in the disabled spot in the front of the store [referring to the 30-40 spots in
16  front of the store]? A. When Michael Nash told me not to park in the disabled parking, I quit
17  parking there for a while because I just didn't want problems." Doc. 185, Ex. E, Jan. 26, 2010
18  Hardin Deposition, at 233:24-234:4 (17 of 42).  However, later on, Plaintiff clarified that Nash
19  told him not to park in the TLE disabled parking and that in response, he "parked in the store's
20  front parking lot, in the disabled spaces for three days. After three days, Plaintiff resumed
21  parking in the TLE's disabled space." Doc. 193, Plaintiff's SUMF, at 15:19-25; Doc. 185, Ex. E,
22  Jan. 26, 2010 Hardin Deposition, at 268:5-24 (24 of 42).  From this evidence, there is no
23  reasonable inference that Plaintiff was ever actually denied use of a disabled parking spot.
24  Though Nash's statement to Plaintiff is problematic, the fact that it did not cause any disruption
25  to Plaintiff's use of disabled parking spots is determinative.

26          Summary adjudication of the reasonable accommodation and interactive process claims is
27  granted.

28

**4. Harassment**

FEHA prohibits " Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." Cal. Gov. Code §12940(j). "FEHA makes the employer strictly liable for harassment by a supervisor." State Dept. of Health Services v. Superior Court, 31 Cal. 4th 1026, 1041 (Cal. 2003).  "FEHA is violated when the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment....In determining what constitutes 'sufficiently pervasive' harassment, the courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of harassment of a repeated, routine of a generalized nature." Etter v. Veriflo Corp., 67 Cal. App. 4th 457, 465 (Cal. App. 1st Dist. 1998). "California Code of Regulations, title 2, section 7287.6, subdivision (b)(1)...provides that harassment includes, but is not limited to, verbal epithets or derogatory comments, physical interference with freedom of movement, derogatory posters or cartoons, and unwanted sexual advances. As the regulation implies harassment consists of a type of conduct not necessary for performance of a supervisory job. Instead, harassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." Janken v. GM Hughes Electronics, 46 Cal. App. 4th 55, 63 (Cal. App. 2d Dist. 1996).  Personnel management action must be analyzed in the context of discrimination as opposed to harassment. Lewis v. UPS, Inc., 252 Fed. Appx. 806, 808 (9th Cir. 2007) (threat of termination can not be analyzed as harassment because it is a personnel management action). However, "some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message" if done in an "unnecessarily demeaning" manner. See Roby v. McKesson Corp., 47 Cal. 4th 686, 709 n.10 (Cal. 2009) (examples include "shunning of Roby during staff meetings, Schoener's belittling of

1    Roby's job, and Schoener's reprimands of Roby in front of Roby's coworkers").

2        Given California's clear distinction between discrimination and harassment, several of

3    Plaintiff's allegations do not qualify as harassment.  The threats to fire or reduce his hours are

4    personnel management actions.  Similarly, conversations in which supervisors informed Plaintiff

5    where he may park may not automatically qualify as harassment.  Plaintiff has not alleged that

6    any of these actions were done in a demeaning or derogatory way.  In his deposition, Plaintiff's

7    description of the discussions concerning his parking do not demonstrate hostility or animus.

8    Doc. 185, Ex. E, Jan. 26, 2010 Hardin Deposition, at 233:24-240:13 and 261:8-270:6 (17-18 and

9    23-25 of 42).  Plaintiff specifically said that when Cox (hiring manager) was explaining to him

10   that Plaintiff was being reduced to a part-time employee, Cox "was not picking on me." Doc.

11   185, Part 1, Ex. F, Dec. 28, 2011 Hardin Deposition, at 436:11-12 (at 7 of 60).

12       Plaintiff's allegations regarding retaliation are derogatory comments, threat of physical

13   harm, not being allowed to wear a hat, and removal of the stool he was using.  Plaintiff alleges he

14   was harassed in 2002 by Nielson (unspecified supervisor): "Nielson met me in front of the Shoe

15   Department, and yelled at me to go back to the Dept. and 'Finish your job.' I asked Nielson, 'Do

16   you want me to clock back in? Nielson replied, 'No I want you to go back and finish your job.'

17   Nielson was yelling and waving his arms, and I left the premises....Nielson told Zane repeatedly,

18   'Older people can't learn some things.'" Doc. 190, Part 4, Ex. 6, Sept. 6, 2010 Declaration, at

19   2:9-16 (3 of 58).  In 2004, Plaintiff alleges Michelle and Jaclyn (assistant managers) refused to

20   clock him in saying "Zane's being a bad boy." Doc. 190, Part 4, Ex. 6, Sept. 6, 2010 Declaration,

21   at 3:9-12 (4 of 58).  Plaintiff wore a hat given him by Mueller (assistant manager) that said

22   "fishing" on the front while working.  At an unspecified time, Alvarado (assistant manager) told

23   him to take the hat off.  Plaintiff spoke with Gillam (store manager) about the incident and

24   Alvarado "flipped me off in the parking lot" and "told me he was going to get me anyway." Doc.

25   189, Part 1, Ex. 2, Jan. 27, 2010 Hardin Deposition, at 388:16-21 (89 of 96).  Plaintiff used a

26   stool provided by Defendant for several years.  In 2009, some dispute over where it should be

27   stored when Plaintiff was not using it arose; Cox (hiring manager) told Plaintiff several times to

28   move it from different places Plaintiff was storing it. Doc. 185, Part 1, Ex. F, Dec. 28, 2011

1   Hardin Deposition, at 521:24-522:13 (11 of 60).  In December 2009, an unspecified manager said

2   Plaintiff had to buy his own stool; Plaintiff said of the conversation "It was on the sales floor. It

3   wasn't a big thing to me. I just went and paid for the stool, and brought it back here." Doc. 185,

4   Part 1, Ex. F, Dec. 28, 2011 Hardin Deposition, at 527:20-23 (12 of 60).  Plaintiff went on

5   vacation in the summer/fall of 2010 and when he returned, the stool he purchased was missing; it

6   is undisputed that the store underwent a remodel from August to November 2010. Doc. 193,

7   Plaintiff's SUMF, at 39:14-15.  Plaintiff asked around but no one knew what happened to the

8   stool; he suspects that "somebody had taken the stool in secret." Doc. 185, Part 1, Ex. F, Dec. 28,

9   2011 Hardin Deposition, at 533:8-19. (14 of 60).

10          These disparate allegations span an approximately eight year period.  They are scattered

11  and do not form a pattern of behavior that is sufficiently severe to constitute a FEHA violation.

12  See Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1189 (9th Cir. 2005) ("'snide remarks' and

13  threats, such as 'your number's up' and 'don't forget who got you where you are'" do not rise to

14  the level of severity that constitutes a hostile work environment under Title VII).  Summary

15  adjudication on the retaliation claim is granted.

16

17  **B. Cal. Civ. Code §51**

18          "All persons within the jurisdiction of this state are free and equal, and no matter what

19  their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic

20  information, marital status, or sexual orientation are entitled to the full and equal

21  accommodations, advantages, facilities, privileges, or services in all business establishments of

22  every kind whatsoever." Cal. Civ. Code §51(b).  As previously stated, this provision does not

23  apply to the employer-employee relationship. See Payne v. Anaheim Memorial Medical Center,

24  Inc., 130 Cal. App. 4th 729, 747 (Cal. App. 4th Dist. 2005).  Plaintiff argues he was denied use

25  of disabled parking at the store while he was there solely as a customer: "Wal-Mart violated

26  Zane's civil rights, by not allowing him to park in the TLE disabled persons parking spots in the

27  TLE area." Doc. 192, Opposition, at 15:8-10.  However, this argument is unsupported by

28  Plaintiff's deposition in which he states that he parked in the TLE disabled spot when he came as

a customer; when told by Nash (assistant manager) that he should not park there, Plaintiff said

"I'm not even working today. I'm off work"....And I just went in the store." Doc. 185, Part 1, Ex.

E, Jan. 26, 2010 Hardin Deposition, at 241:11-13 (19 of 42).  There is no inference that Plaintiff

was denied use of disabled parking as a customer.  Summary adjudication is granted.

**C. Cal. Bus. & Prof. Code §17200**

Plaintiff argues "Wal-Mart's above acts of harassment, discrimination, and retaliation in

violation of Govt. Code §12940, violation of civil code §51 and the ADA are predicate acts that

support Zane's B&P cause of action." Doc. 192, Opposition, at 15:13-16.  As Plaintiff's FEHA

and Cal. Civ. Code §51 claims are adjudicated in favor of Defendant, Plaintiff's Cal. Bus. &

Prof. Code §17200 similarly fails.

**D. Breach of Contract and Promissory Estoppel**

Plaintiff asserts that "The parties reached a set agreement on full-time status, hours, and

months off. The key is the reliance, Zane committed to the schedule and work, in reliance on the

promised schedule." Doc. 192, Opposition, at 15:21-24.  Plaintiff claims it was a "verbal

contract." Doc. 100, TAC, at 22:17-18.  Plaintiff describes the contract as follows:

> On 7-18-2004 I turned 62 years old. I made an appointment with Don Wallis (store
> manager of store #2985.) I advised Don that I had applied for social security benefits and
> would need to reduce my hours at Wal-Mart. I advised Don that I would also need 90
> days leave of absence per year. I stated 'I don't care which months that I take off as long
> as I get 90 days off.' Don advised me that he felt it would be best for Wal-Mart if I would
> take Jan., Feb., and Sept. off. I agreed. Don told me to talk with Eleno Bernal (sporting
> goods dept. manager) and work out a reduced schedule. I went to Eleno and we worked
> out a reduced schedule. As per agreement, I would work Wed., Thurs., Fri., and Sat.
> starting at 7:00 am until 4:00 pm. Eleno and I went back to Don and presented the
> schedule to Don. Don agreed with the schedule and stated 'This will be Zane's "set"
> hours.'

Doc. 190, Part 4, Ex. 6, March 29, 2006 Letter, (31 of 58).

"The standard elements of a claim for breach of contract are (1) the contract, (2)

plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to

plaintiff therefrom." Wall Street Network, Ltd. v. New York Times Co., 164 Cal. App. 4th 1171,

1178 (Cal. App. 2nd Dist. 2008), citations omitted.  A promissory estoppel claim requires "(1) a

1  promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is

2  made; (3) his reliance must be both reasonable and foreseeable; (4) the party asserting the

3  estoppel must be injured by his reliance." Graddon v. Knight, 138 Cal. App. 2d 577, 583 (Cal.

4  App. 1st Dist. 1956).

5      In key part, Plaintiff and Wallis did not agree as to how long the contract would last.

6  California law states that "An employment, having no specified term, may be terminated at the

7  will of either party on notice to the other." Cal. Labor Code §2922.  Plaintiff bears the burden of

8  establishing the terms of the employment contract he is suing under. See Mateo v. M/S Kiso, 805

9  F. Supp. 761, 775 (N.D. Cal. 1991).  "[A] court may limit a contractual duty to a judicially

10  determined 'reasonable time' only after other tools of construction have failed to establish an

11  intended duration." McCaskey v. California State Automobile Assn., 189 Cal. App. 4th 947, 966

12  (Cal. App. 6th Dist. 2010).  In this case, there is absolutely no evidence as to duration; the court

13  finds the contract could be terminated at will by either party with notice.  There is no assertion

14  that Defendant did not give Plaintiff notice of the change in employment conditions.  The

15  promissory estoppel claim also fails as Plaintiff does not assert a clear and unambiguous promise

16  that the specified terms as to hours and benefits would last through 2010.  Summary adjudication

17  of the breach of contract and promissory estoppel claims is granted.

18

19  **E. Conversion**

20      "Stated generally, conversion is any act of dominion wrongfully exerted over another's

21  personal property in denial of or inconsistent with his rights therein."  Zaslow v. Kroenert, 29

22  Cal.2d 541, 549 (1946).  "Conversion is an intentional tort." Don King Productions/Kingvision

23  v. Ferreira, 950 F. Supp. 286, 290 (E.D. Cal. 1996).  "[N]either good nor bad faith, neither care

24  nor negligence, neither knowledge nor ignorance, are of the gist of the action [of conversion]."

25  Gonzales v. Pers. Storage, 56 Cal. App. 4th 464, 476-77 (Cal. app. 4th Dist. 1997).  "Negligence

26  in caring for the goods is not an act of dominion over them such as is necessary to make the

27  bailee liable as a converter." George v. Bekins Van & Storage Co., 33 Cal. 2d 834, 838 (1949).

28      Plaintiff states,"Greg Cox - Gregory Cox is the one who told me where to place the stool,

1   so as far as I know, he's the only one who knew where the stool was at." Doc. 185, Part 1, Ex. F,

2   Dec. 28, 2011 Hardin Deposition, at 533:23-534:1 (14 of 60).  Plaintiff asked around but no one

3   knew what happened to the stool; he suspects that "somebody had taken the stool in secret." Doc.

4   185, Part 1, Ex. F, Dec. 28, 2011 Hardin Deposition, at 533:8-19. (14 of 60).  Plaintiff admits

5   that he has no idea what happened to the stool. Doc. 185, Part 1, Ex. F, Dec. 28, 2011 Hardin

6   Deposition, at 534:10-11 (14 of 60).  Defendant is correct that Plaintiff is simply speculating as

7   to what happened to his stool; his evidence raises no triable issue of fact that Defendant took his

8   stool.  At most, Plaintiff can assert that Defendant was negligent in caring for his stool, but as a

9   bailee, that does not constitute conversion.  Summary adjudication on the conversion claim is

10  granted.

11

12  **F. Defamation**

13         Plaintiff states "Wal-Mart's personnel created a false and misleading report stating Zane

14  caused his own injury, and Zane is not made aware of the contents of the report, until after he

15  files suit herein, and discovery is exchanged." Doc. 100, TAC, at 26:4-7.  Plaintiff alleges "On

16  October 20, 2004 at 12:40 a.m., the overnight manager tells me to put pallet onto shelves by 1

17  a.m. I tell him I need help. The manager refuses help, and tells me to do the work. I injure my

18  back." Doc. 190, Part 5, Feb. 6, 2012 Hardin Declaration, at 4:10-16. (5 of 35).  Defendant's

19  report states "On 10 20 04 Zane was working in the Furniture Department working up a pallet of

20  freight. He lifted a box that weighed 100lbs. When lifting the box Zane twisted his back. Zane

21  did not ask for anyone to help him with a team lift." Doc. 190, Part 5, Ex. 7, Ex. A, (11 of 35).

22         "Defamation is an invasion of the interest in reputation. The tort involves the intentional

23  publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure

24  or which causes special damage. Publication means communication to some third person who

25  understands the defamatory meaning of the statement and its application to the person to whom

26  reference is made. Publication need not be to the 'public' at large; communication to a single

27  individual is sufficient. Reprinting or recirculating a libelous writing has the same effect as an

28  original publication." Smith v. Maldonado, 72 Cal. App. 4th 637, 645 (Cal. App. 1st Dist. 1999).

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45.  "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof." Cal. Civ. Code §45a.  "Whether a publication is libelous on its face, or, as sometimes referred to by the cases, 'libelous per se,' is a question of law." Williams v. Daily Review, Inc., 236 Cal. App. 2d 405, 410 (Cal. App. 1st Dist. 1965), overruled on other grounds by Brown v. Kelly Broadcasting Co., 48 Cal. 3d 711, 732 n.18 (Cal. 1989).

Defendant presumes that the statement is not libelous on its face by arguing that Plaintiff has not suffered any special damage.  When looking at the language at issue ("When lifting the box Zane twisted his back. Zane did not ask for anyone to help him with a team lift.") the court finds that the statement is not libelous on its face.  The statement is neutral and does not accuse Plaintiff of incompetence.  In order to constitute libel per se in this context, a statement must "injure plaintiffs' reputation with respect to their occupation....without the necessity of resorting to extrinsic material." Williams v. Daily Review, Inc., 236 Cal. App. 2d 405, 411 (Cal. App. 1st Dist. 1965) (found libel pe se because statement insinuated "that plaintiffs were responsible for the delay in the 'A' Street project and that they were incompetent in the preparation of their bids for the job and in the performance of the job itself").  In general, "unless an employer's performance evaluation accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior it cannot support a cause of action for libel. This is true even when the employer's perceptions about an employee's efforts, attitude, performance, potential or worth to the enterprise are objectively wrong and cannot be supported by reference to concrete, provable facts." Gould v. Maryland Sound Industries, Inc., 31 Cal. App. 4th 1137, 1153 (Cal. App. 2d Dist. 1995), quoting Jensen v. Hewlett-Packard Co., 14 Cal. App. 4th 958, 966 (Cal. App. 4th Dist. 1993).

51

1    If a false statement is not libelous on its face, a plaintiff must show special damages,

2    defined as "all damages which plaintiff alleges and proves that he has suffered in respect to his

3    property, business, trade, profession or occupation, including such amounts of money as the

4    plaintiff alleges and proves he has expended as a result of the alleged libel, and no other." Cal.

5    Civ. Code §48a(4)(b).  Plaintiff alleges "The false report is damaging to Zane's reputation and

6    ability to advance, as it falsely reflects he was irresponsible, not to be relied upon, and lacking in

7    judgment." Doc. 100, TAC, at 26:10-12.  As determined above Plaintiff did not apply for a

8    promotion after 2004.  In fact, "Wal-Mart's internal business records indicate that Plaintiff's last

9    application for promotion was August 28, 2004 for the position of Department Manager for

10   Department 8 (Pets), for which he was interviewed on September 1, 2004." Doc. 186, Ex. 5,

11   Zobel Declaration, at 4:3-5 (143 of 210).  Plaintiff's injury took place on October 4, 2004.

12   Plaintiff has not alleged that his career has suffered any setback due to the defamation.  Summary

13   adjudication for the defamation claim is granted.

14

15   **G. Intentional Infliction of Emotional Distress**

16   "The elements of the tort of intentional infliction of emotional distress are: (1) extreme

17   and outrageous conduct by the defendant with the intention of causing, or reckless disregard of

18   the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme

19   emotional distress; and (3) actual and proximate causation of the emotional distress by the

20   defendant's outrageous conduct. Conduct to be outrageous must be so extreme as to exceed all

21   bounds of that usually tolerated in a civilized community." Christensen v. Superior Court, 54

22   Cal. 3d 868, 903 (Cal. 1991), citations omitted.  "Liability for intentional infliction of emotional

23   distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or

24   other trivialities." Hughes v. Pair, 46 Cal. 4th 1035, 1051 (Cal. 2009), citations omitted.  Nothing

25   alleged by Plaintiff meets the requirement of "extreme and outrageous conduct."  Plaintiff was

26   subject to insults and inconveniences, not conduct outside the bounds of civilized community.

27

28   **H. Negligent Infliction of Emotional Distress**

52

"The negligent causing of emotional distress is not an independent tort but the tort of negligence. The traditional elements of duty, breach of duty, causation, and damages apply." Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc., 48 Cal. 3d 583, 588 (Cal. 1989), citations omitted.  Plaintiff alleges "Wal-Mart breached its duty of care by negligently harassing, retaliating against, and discriminating against Zane." Doc. 100, TAC, at 24:24-26.  As summary adjudication is being granted in favor of Defendant for the FEHA causes of action, this claim must also fail.


**V. Order**

Defendant's motion for summary judgment is GRANTED.


IT IS SO ORDERED.

Dated:   March 2, 2012      _____

CHIEF UNITED STATES DISTRICT JUDGE